```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CYNTHIA M. SANDERS,                        )
                                           )
                    Plaintiff,             )
                                           )
          vs.                              )
                                           )
THE UNIVERSITY OF PITTSBURGH; ELLEN        )
RUDY, acting individually and in her       )
capacity as an administrator for           )
Defendant University of Pittsburgh;        )
JOHN CLOCHESY, acting individually and     )
in his capacity as an administrator for    )
Defendant University of Pittsburgh;        )    CA No. 01-1832
JOHN O'DONNELL, acting individually and    )
in his capacity as an administrator for    )
Defendant University of Pittsburgh;        )
LYNETTE W. JACK, acting individually       )
and in her capacity as an administrator    )
for Defendant University of Pittsburgh;    )
UPMC SHADYSIDE, a Pennsylvania non-        )
profit corporation; UPMC HEALTH SYSTEM;    )
and UPMC PRESBYTERIAN,                      )
                                           )
                    Defendants             )
```

## MEMORANDUM


Pending before the Court are motions by UPMC Shadyside, UPMC

Health System, and UPMC Presbyterian (collectively, "UPMC

Defendants") and by the University of Pittsburgh, Ellen Rudy,

John Clochesy, John O'Donnell, and Lynette W. Jack (collectively,

"University Defendants"), each seeking summary judgment with

regard to the claims of Plaintiff Cynthia M. Sanders.  (*See*,

respectively, Docket Nos. 89 and 92.)  For the reasons discussed

below, the pending motions are granted in their entirety and

Plaintiff's case is dismissed with prejudice.

I.   **INTRODUCTION**

   A.   <u>Factual Background</u>[1]

        At the time of the events which gave rise to this legal action, Plaintiff Cynthia M. Sanders, an African-American woman, was approximately 43 years old.  She completed the requirements for a bachelors degree in nursing from the University of Pittsburgh ("University") in 2000.

        During the period January 1999 through June 2001, Ellen Rudy was Dean of the University's School of Nursing ("SON"), John Clochesy was Assistant Dean of Clinical Affairs,[2] and Lynette Jack was Director of Student Services for Registered Nurse Options and Graduate Programs at the SON.  The School of Nursing allows participants in its degree completion program to apply for graduate programs before they finish their undergraduate study. One of those graduate programs is the Nurse Anesthesia Program ("NAP.")  According to University Defendants, the NAP is a nationally recognized, highly competitive program, the graduates of which are Certified Registered Nurse Anesthetists. (Memorandum of Law in Support of University Defendants' Motion for Summary Judgment, Docket No. 93, "Univ. Defs.' Memo," at 3.) Before a student begins full-time study in the NAP, he or she

_____

        [1]  Unless otherwise noted, the facts in this section are undisputed.

        [2]  Mr. Clochesy left the SON in July 1999 and accepted a position with Case Western Reserve University in Cleveland, Ohio.

must have a minimum of one year's experience as a registered nurse in a hospital critical care or intensive care unit, a requirement established not by the University but by the American Association of Nurse Anesthetists Council on Accreditation.  NAP candidates may be accepted for part-time study if they are in the process of completing this requirement at the time they apply.

Ms. Sanders wrote to John O'Donnell, Director of the NAP, on January 7, 1999, stating that she had begun the NAP application process and had "secured a position as a critical care nurse in the Medical/Surgical critical care unit at UPMC Shadyside Hospital. . . . In addition, I have made arrangements to take the Miller Analogy Test."  She also mentioned that she was seeking admission to the Class of 2002,[3] even on a provisional basis, and had support from her advisor, Ms. Jack, in this effort. (Plaintiff's Appendix to Brief in Opposition to Defendants' Motions for Summary Judgment and Partial Summary Judgment, Vol. 3, Docket No. 103, "Plf.'s App. 3," Exhibit 25, Deposition of John O'Donnell, February 21, 2003, "O'Donnell 2/21/03," Depo. Exh. 12.)

On January 26, 1999, Ms. Jack wrote to Plaintiff, summarizing her current standing in the nursing undergraduate program.  She noted that Ms. Sanders had not yet submitted scores

---

[3]  NAP classes are identified by the year in which full-time students complete the program.  That is, successful applicants interviewed in late 1999 and early 2000 began the program in August 2000 and, if studying full-time, graduated in December 2002.

from four required nursing examinations and that she still had "G" grades in two courses.[4]  In addition, she advised Plaintiff that test scores from the Graduate Record Examination ("GRE") and letters of recommendation had not yet been submitted in support of her application.  (Plaintiff's Appendix to Brief in Opposition to Defendants' Motions for Summary Judgment and Partial Summary Judgment, Vol. 2, Docket No. 102, "Plf.'s App. 2," Exhibit 19, Deposition of Lynette Jack, "Jack Depo.," Depo. Exh. 1.)  Although Ms. Sanders promptly responded to this letter correcting some of Ms. Jack's misconceptions about the missing final grades and the nursing exams, Plaintiff did not question the statement that the GRE test was required in addition to or in lieu of the Miller Analogy Test ("MAT"), nor did she remind Ms. Jack that she had previously been told the MAT was an acceptable alternative.  (Jack Depo. Exh. 2.)

While completing her undergraduate nursing degree, Plaintiff was hired as an emergency relief nurse[5] in the Medical/Surgical Intensive Care Unit ("Med/Surg ICU") at UPMC Shadyside Hospital ("Shadyside") as of February 1, 1999.  By May, she had completed at least part of the specialized orientation classes required for

_____

[4]  A "G grade" indicated that due to extenuating circumstances, the student had not completed the requirements of the course, but would be given the opportunity to do so within 3 semesters after the G grade was posted.  (Jack Depo. Exh. 1.)

[5]  The position of "emergency relief nurse" was not a full-time position, but rather indicated that Ms. Sanders was on-call to work as necessary.  (Second Amended Complaint, ¶ 53.)

an ICU position and on July 21, 1999, she began clinical orientation in the Med/Surg ICU.  On July 28, after four days of orientation, Plaintiff met with Catherine Witsberger, a nurse education specialist, Margaret Sweeney, Critical Care Coordinator and Plaintiff's direct supervisor, and Moira Nelson, Ms. Sanders' preceptor,[6] to discuss the results of her orientation tests. During that meeting, Plaintiff claims that Ms. Witsberger and Ms. Sweeney told her "there were certain things that [you] shouldn't have missed;" "you never should have been hired;" "[Shadyside] doesn't hire people with your lack of experience," and "Shadyside cannot make an investment in you."  (Plf.'s App. 3,  Exhibit 29, Deposition of Cynthia M. Sanders, "Sanders Depo.," Depo. Exh. 23; Appendix to Motion for . . . Summary Judgment, Docket No. 91, "UPMC App.," Exhibit A, Sanders Depo., at 134.)

Ms. Sanders was then sent to the Neurology Intensive Care Unit ("Neuro ICU") for orientation.  There, she claims she was subjected to discriminatory actions by a Caucasian supervisor, e.g., not being allowed to work with an African-American secretary, and to derogatory remarks, e.g., being told that she should be working at a nursing home as a nursing assistant rather than as a registered nurse, and that she should get out of the Neuro ICU and "go back where [she] came from."  According to

_____

[6]  Ms. Nelson was Ms. Sanders' preceptor during a clinical course at Shadyside.  Plaintiff received a "satisfactory" rating from Ms. Nelson, whom she described as an "excellent" preceptor.  (Plf.'s App. 1, Exhibit 9, Affidavit of Cynthia M. Sanders, ¶ 30, and Aff. Exh. 22.)

Plaintiff, neither the Med/Surg ICU nor the Neuro ICU employed any African-American nurses.  (Plaintiff's Appendix to Brief in Opposition to Defendants' Motions for Summary Judgment and Partial Summary Judgment, Vol. 1,  Docket No. 101, "Plf.'s App. 1," Exhibit 11, Plaintiff's Second Supplemental Affidavit, "Plf.'s Sec. Supp. Aff.," ¶¶ 14, 29.)

Upset at the events in the Neuro ICU, Ms. Sanders reported them on July 30 to Ms. Nelson who in turn alerted Chris Smith, the Director of Critical Care at Shadyside.  On August 2, 1999, Ms. Sanders met with Ms. Smith, Ms. Sweeney, and Ms. Nelson for a "clinical orientation planning meeting" in which they discussed steps that would be taken to help Plaintiff achieve the goals of orientation.  That same day, Ms. Sanders told Ms. Smith that she was being given assignments inconsistent with her capabilities as a registered nurse and that co-workers and supervisors were making derogatory remarks which she perceived as racist.  In addition, she questioned the apparent lack of African-American nurses throughout the hospital, particularly in the management/ education team for the Med/Surg ICU.  Also on August 2, Judy Jim, a Shadyside nurse-recruiter, alerted the Shadyside human resources department that Ms. Smith was "probally [sic] going to try and discipline or fire Sanders."  (Plf.'s App. 3, Exhibit 27, Deposition of Melissa Pelisari, "Pelisari Depo.," Depo. Exh. 2.) According to Ms. Sanders, Human Resources Manager Marilyn Walters, Susan Martin, one of the Multi-Unit Directors, and Ms.

Sweeney began making plans to fire her soon thereafter.
(Plaintiff's Memorandum of Law in Opposition to UPMC Defendants'
Motion for Summary Judgment, Docket No. 100, "Plf.'s Opp. to UPMC
Mot.," at 13-14.)

In the period from August 2 through September 10, 1999,
Plaintiff worked at Shadyside only nineteen days, either in a
non-critical care environment or doing untrained work as a
nurse's assistant.  On August 10, she mentioned to Ms. Smith that
the African-American nurses aides with whom she worked were upset
about her treatment; she told Ms. Smith "she felt there were
issues regarding race relations" and asked if there were "a
systemic problem."  (Plf.'s Sec. Supp. Aff., ¶ 20.)  After
September 10, her name was removed from the work schedule and,
despite telephone calls and e-mails to her preceptors, she was
unable to learn her next assignment.  (Plf.'s App. 1, Exhibit 9,
Plaintiff Cynthia M. Sanders' Affidavit, "Plf.'s Aff.," ¶ 55 and
Aff. Exh. 30.)

Ms. Sanders was asked to attend a meeting with Ms. Martin,
Ms. Sweeney, and Ms. Walters on October 4, 1999, ostensibly to
discuss her progress in orientation.  Only after the meeting
began, with a security officer standing by, did Plaintiff realize
that it was a termination meeting.  At that meeting, she was told
that she was "not moving fast enough," and could not give her
patients adequate care.  She asked to see her preceptors' notes
about her performance, but was refused.  She was accused of

7

calling preceptors at home and making "weird" statements, which
she denied.  Plaintiff was "astounded" by these remarks.  When
she refused to resign, she was fired immediately.  To add insult
to injury, Shadyside assigned security guards to follow Plaintiff
when she came to clean out her locker and posted her picture in
the guard house in order to alert security staff that she should
not be re-admitted.  (Plf.'s Opp. to UPMC Mot. at 22-23.)  She
eventually received a letter confirming her dismissal dated
October 13, 1999.  Ms. Sanders asserts that the letter contained
many reasons for her termination which were "phony and without
merit or value," including claims that she took copies of
patients' records home with her in violation of hospital policy.
(Plf.'s App. 3, Sanders Depo. at 468.)  After her termination, a
note was made in the UPMC employee database that she was
"unsuitable for rehire."

    Meanwhile, Plaintiff continued to pursue her application to
the NAP.  She took the MAT in June and received a score of 49 out
of a possible 100 points.  On August 3, 1999, Ms. Jack again
wrote to Plaintiff, stating that the faculty of the NAP had
reviewed her application for the Class of 2001, and had "deferred
taking action on the application at this time, since there is no
available space for either full time or part time study for that
term," but would review her application when space became
available.  (Reply to Plaintiff's Brief in Opposition to
Defendants' Motion for Summary Judgment, Docket No. 111, "Univ.

Defs.' Reply," Exhibit B.)  Ms. Jack also provided Plaintiff with three faculty suggestions for her "continued career development" – complete the undergraduate nursing program, "take the GRE, and demonstrate math skills necessary for [the NAP] through a competitive score on that examination," and "continue to accumulate work experience and clinical judgment in a critical care setting."  She also noted that "when you take the GRE, you can have your score sent to the Student Services Office."  (Id.) Again, there is no evidence that Ms. Sanders questioned this advice or sought additional assistance from Ms. Jack to help her comply with these suggestions.

Mr. O'Donnell wrote to Ms. Sanders on October 27, 1999, inviting her to interview for the NAP program.  Ms. Sanders sat for the GRE in December 1999 and received a score of 1130.  The GRE  measures a graduate school candidate's abilities in three areas – verbal, quantitative and analytical.  While her verbal score placed her in the 64th percentile of applicants who took the test on that date, she scored in the second percentile in quantitative ability and in the tenth percentile for analytical skills.  These scores were not received at the SON until January 4, 2000, thus the only standardized test score in her application at the time of the interview on December 17, 1999 was from the MAT.  (O'Donnell 2/21/03, Depo. Exh. 21.)  Plaintiff was interviewed by three members of the SON faculty, all of whom were Caucasian women.  Normally, Mr. O'Donnell would have participated

9

as a fourth member of the interview team, but declined to do so in Ms. Sanders' case because, he testified, he knew her socially as a result of her long-term relationship with another SON faculty member, Robbi Ewell.  In addition, he had personally assisted her through the application process.  (O'Donnell 2/21/03 at 105-106.)

Of 110 applicants for the NAP Class of 2002 interviewed in late 1999 and early 2000, 28 were accepted for either full- and part-time study.  Ms. Sanders received a letter dated January 25, 2000, from Ms. Jack, stating in part: "You were reviewed in competition with other applicants to the program.  I regret to inform you that you have not been recommended for admission." (O'Donnell 2/21/03, Depo. Exh. 24.)  In later conversations with Mr. O'Donnell, Ms. Sanders was told that the admissions committee "did not credit her MAT" score, that is, she was not accepted because of her poor performance on the GRE.  (Plaintiff's Memorandum of Law in Opposition to the University Defendants' Motion for Summary Judgment, Docket No. 99, "Plf.'s Opp. to Univ. Mot.," at 18.)

Ms. Sanders' application to the NAP was put on hold while she completed the requirements for her undergraduate degree and pursued graduate courses with the intent of transferring them to the NAP program at a later date.  She did not work as a critical care nurse and implies that she could not do so due to the note in the UPMC employee database that she was unsuitable for re-

10

hire.  (Plf.'s Opp. to UPMC Mot. at 24.)  She did not re-take the
GRE as Ms. Jack suggested.

Meanwhile, Ms. Sanders' "significant other" of nearly ten
years, Robbi Ewell, was having his own difficulties with the
School of Nursing.  In December 1998, Mr. Ewell had been advised
that his contract as Director of the SON Learning Resource Center
would not be renewed when it expired on June 30, 1999.  Mr. Ewell
began an internal appeal of this decision, claiming that his
contract was terminated due to wide-spread racial discrimination
by administrators of the SON.  While the internal appeal was
still pending, Mr. Ewell filed a claim of discrimination against
the University with the Equal Employment Opportunity Commission
("EEOC") in January 2000.  Ms. Sanders admitted at her deposition
that while she talked with Mr. Ewell about his controversy with
the University, particularly those areas they "felt crossed over
to issues" she was having with the University, she did not help
him prepare the charge of discrimination.  And although two of
Mr. Ewell's co-workers were asked by the EEOC to provide
information about his claim, Ms. Sanders never testified or made
any written statements in support of his charge.  (UPMC App.,
Sanders Depo. at 28-32.)  On April 17, 2001, the EEOC concluded
that Mr. Ewell's race was a factor in the decision not to renew
his contract.  (Plf.'s App. 1, Exhibit 6, Supplemental Affidavit
of Robbi Ewell, "Ewell Supp. Aff.," ¶ 5.)

On April 9, 2001, Ms. Sanders met with Mr. O'Donnell to

discuss the status of her application to the NAP.  In a letter to
Plaintiff dated June 18, 2001, Mr. O'Donnell wrote in part:

> When I met with you . . . , I emphasized the importance
> of a high level of achievement (A or B) in the Non-
> Degree Seeking Courses that you were at that time
> taking in order to demonstrate your ability to succeed
> in our program. . . . I have reviewed your grades in
> those courses and I note that you received a C in
> Graduate Pharmacology and a G grade in Pathophysiology.
> I would rate the Graduate Pharmacology course as
> roughly equivalent in difficulty to one of the lower
> level Nurse Anesthesia courses.  I also noted that we
> do not have any record that you have retaken the GRE
> with an improved score.
>
> We currently have 13 qualified applicants on a waiting
> list . . . and anticipate that the 2001-2002 applicant
> pool will remain intensely competitive.  Based on your
> most recent academic performance in the Graduate
> Curriculum and your overall GRE score, I do not believe
> that you will be competitive for admission in the
> coming year.

(O'Donnell 2/21/03, Depo. Exh. 41.)

Ms. Sanders interpreted this letter as an indication that
she would never be accepted to the Nurse Anesthetist Program, a
decision she believed was due to the fact that she was African-
American and had been labeled a "troublemaker" because of her
relationship with Mr. Ewell.

B.   <u>Procedural History</u>

On December 21, 2000, Ms. Sanders filed a Charge of
Discrimination with the EEOC, stating that UPMC Shadyside had
discriminated against her on the basis of age and race and
retaliated against her when she complained of discrimination,
thus violating Title VII of the Civil Rights Act of 1964, 42

U.S.C. § § 2000e *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA.") Plaintiff filed suit in this Court on October 2, 2001, naming as defendants the University, Ms. Rudy, Mr. Clochesy, Mr. O'Donnell and Ms. Jack (the last four, collectively, "Individual Defendants"), Shadyside, UPMC Health System (the parent organization of Shadyside), and UPMC Presbyterian Hospital.  The allegations against the Individual Defendants are raised in both their official and individual capacities.  In the Second Amended Complaint, the version which is the subject of the pending motions (Docket No. 82, "Compl."), Ms. Sanders states five claims against the University and/or the Individual Defendants for racial discrimination and retaliation, violation of her First Amendment rights, and conspiracy, and four claims against the UPMC Defendants for violations of federal statutes against race and age discrimination and retaliation.  Each of these allegations will be discussed below.

     C.   <u>Jurisdiction and Venue</u>

     Jurisdiction is based on Ms. Sanders' claims under Title VII, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 1983, and 28 U.S.C. § 1331.  Venue is appropriate in this Court inasmuch as the events giving rise to the claims all occurred within this judicial district.  28 U.S.C. § 1391(b).

**II.  STANDARD FOR SUMMARY JUDGMENT**

     A court may grant summary judgment if the party so moving

can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,  . . . that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c));  Rossetti v. Busch Entertainment Corp., 87 F. Supp.2d 415 (E.D. Pa. 2000).  If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material.  A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor.  Rossetti, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  In short, the movant must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the opposing party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in favor of the movant.  Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

14

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." <u>Celotex</u>, <u>id.</u> at 322-23; <u>Rossetti</u>, <u>id.</u>; Fed.R.Civ.P. 56(e).  The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs.  <u>Liberty Lobby</u>, <u>id.</u> at 250-252; <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 633 (3d Cir. 1995).

**III. LEGAL ANALYSIS**

    A.   <u>Claims against University Defendants</u>

        1.   *Count I – Racial Discrimination in Violation of 42 U.S.C. § § 1981 and 1983*

In Count I of her Second Amended Complaint, Ms. Sanders claims that the University and Individual Defendants engaged in unconstitutional racial discrimination in denying her admission to the NAP.  Specifically, Ms. Sanders argues that the University established or implemented policies and/or customs that enabled its employees to act with deliberate indifference to the constitutional rights of individuals by: (1) tolerating discrimination and retaliation against African-American students, particularly in the graduate program admissions process; (2)

discriminating against African-American faculty; (3) failing to adequately supervise, discipline or train its administrators; (4) failing to properly investigate claims of racial discrimination; and (5) allowing an environment of intimidation against individuals who supported the discrimination claims of others. (Compl., ¶ 203.)  Plaintiff alleges that she did not receive the same consideration as applicants of other races in that the NAP administrators improperly used test scores as the sole criterion in reviewing her application, ignored other stated criteria, and subjectively denied her admission to the program.  (Id., ¶¶ 204 and 213.)  Plaintiff concludes, "NAP refused and failed to admit Plaintiff to its program even though at the times she was denied [admission] she was comparable to or more qualified than some white students who were admitted."  (Id., ¶ 214.)

In their Motion for Summary Judgment, University Defendants argue that Count I must be dismissed because Plaintiff has failed to show that her rejection from the NAP was the result of racial discrimination.  Second, they argue that Plaintiff cannot show that she was treated differently from any non-minority applicant in a substantially similar position and therefore, her claim of individual disparate treatment in the admissions process must fail.  Third, Plaintiff cannot show that the University or any of the Individual Defendants acted with specific intent to discriminate against her because of her race.  Finally, with regard to the claims brought against Defendants Rudy, Clochesy,

O'Donnell and Jack in their individual capacities, such claims
must fail because Defendants are entitled to qualified immunity.
(University Defendants' Motion for Summary Judgment, Docket No.
92, "Univ. Defs.' Mot.," at 2-3.)

Plaintiff first seeks redress under 42 U.S.C. § 1981(a)
("Section 1981"), which provides:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a).

The Supreme Court has recently reiterated that Section 1981
was "meant, by its broad terms, to proscribe discrimination in
the making or enforcement of contracts against, or in favor of,
any race" and "that a contract for educational services is a
'contract' for purposes of § 1981." Gratz v. Bollinger, 539 U.S.
244, 276, n.23 (2003); see also Runyon v. McCrary, 427 U.S. 160,
172 (1976).

Section § 1983 provides a different sort of constitutional
protection.  This section provides in relevant part that:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State .
> . . subjects, or causes to be subjected, any citizen of
> the United States . . . to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other

proper proceeding for redress[.]

42 U.S.C. § 1983.

As the Court of Appeals explained in Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 1999), "to state a claim under § 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law,[7] deprived her of a federal constitutional or statutory right."  That is, Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right" provided elsewhere.  Id.

Both Section 1981 and Section 1983 claims are analyzed pursuant to the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507 (1993). Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997).  Briefly stated, this three-step process first requires the plaintiff to establish by the preponderance of the evidence a *prima facie* case of discrimination.  The exact requirements of the *prima facie* case may vary, depending upon the type of discrimination alleged and the relationship between the parties.  Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3d Cir. 1999).  If the

_____

[7] The University concedes without discussion that as a state-related institution, it may be considered a "state actor" for purposes of ascertaining liability under 42 U.S.C. § 1983.

plaintiff satisfies this first step, a presumption of discriminatory intent on the part of the defendant has been created.  <u>Stewart</u>, 120 F.33d at 432.  The burden then shifts to the defendant to provide an explanation to rebut the presumption of discrimination, that is, evidence that there was a legitimate, nondiscriminatory reason for the action taken against the plaintiff.  This stage does not involve a credibility assessment in that the defendant must only introduce admissible evidence which, if taken as true, would permit a jury to find that the nondiscriminatory reason for its decision was legally sufficient to justify the action.  If the defendant meets this burden, the presumption of discrimination established by the plaintiff drops from the case.  In step three, the burden of production shifts back to the plaintiff who must now show that the defendant's reason was simply pretextual.  She may accomplish this goal by convincing the court either that discriminatory animus was the likely motivator for the adverse action or that the defendant's proffered explanation is unworthy of credence.  <u>Stewart</u>, <u>id.</u> (internal quotations and citations omitted).  In the Third Circuit, the Court has explained that in order to make the requisite showing of pretext,

> the plaintiff cannot simply show that the [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [defendant], not whether the [defendant] is wise, shrewd, prudent, or competent. Rather, the . .. plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered

legitimate reasons for its action that a reasonable
factfinder could rationally find them unworthy of
credence, and hence infer that the [defendant] did not
act for [the asserted] nondiscriminatory reasons.

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1990) (internal
quotations omitted).

The McDonnell Douglas paradigm "has been adapted for the
educational context and requires the plaintiff to prove that '(1)
she is a member of a protected class; (2) she suffered an adverse
action at the hands of the defendants in her pursuit of her
education; (3) she was qualified to continue in her pursuit of
her education; and (4) she was treated differently from similarly
situated students who are not members of the protected class.'"
Manning v. Temple Univ., CA No. 03-4012, 2004 U.S. Dist. LEXIS
26129, *15 (E.D. Pa. Dec. 30, 2004), quoting Bell v. Ohio State
Univ., 351 F.3d 240, 252-53 (6th Cir. 2003).

Turning to each of Plaintiff's subsidiary claims in Count I,
we may dispense with several in short order.  Plaintiff alleges
that the University established policies and/or customs which
allowed its employees to discriminate against African-American
faculty, to ignore or inadequately investigate claims of racial
discrimination and to indulge in intimidation against individuals
who supported the discrimination claims of others.  In her
memorandum of law opposing the University Defendants' motion for
summary judgment, Plaintiff does not directly address these
allegations.  However, to the extent she still believes these
claims are viable, they must fail.  Simply asserting that the

University had a "policy or custom" which had a disproportionate effect on certain minorities or allowed employees to act "with deliberate indifference" regarding the constitutional rights of any individual does not establish a violation of Section 1981 or 1983. To the contrary, these statutes provide a private cause of action for intentional discrimination only. <u>Gen. Bldg. Contractors Assoc. v. Pennsylvania</u>, 458 U.S. 375, 391 (1982). Moreover, as far as the record shows, Ms. Sanders was not a University faculty member; she did not file a claim of discrimination which the University ignored or failed to investigate; and she has not shown that the University attempted to intimidate her in any way when she supported the discrimination claims of Mr. Ewell or anyone else. Thus, she could not have suffered an "injury in fact" as a result of these alleged actions by the University Defendants, and consequently lacks standing to bring them. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (one of the requirements of standing is that the plaintiff has suffered "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.")

Nor has Plaintiff supported the allegation in her Second Amended Complaint that the University Defendants tolerated "discrimination and retaliation against African-American students, particularly in the graduate program admissions process." (Compl., ¶ 203.) While Plaintiff is correct in her

statement that the NAP Class of 2002 was overwhelmingly
Caucasian, she has presented no evidence that the University
Defendants either discouraged non-Caucasian applicants to the
program or, conversely, deliberately encouraged only Caucasians
to apply.  The statistics compiled by the SON on which Plaintiff
relies to show racial discrimination on the part of University
administrators merely summarize data concerning students already
admitted to the various SON programs. (*See*, e.g., Plf.'s App. 1,
Exhibit 8, Supplemental Affidavit of Helen R. Kotler, "Kotler
Supp. Aff.," Exhs. 19-20, 22-23).  As the Court concluded in
Narin v. Lower Marion Sch. Dist., 206 F.3d 323, 335 (3d Cir.
2000), where the plaintiff compiled a list of newly hired
teachers by age in an attempt to prove that the school district
discriminated against older teachers in its hiring practices,
such statistics could only be considered probative evidence of
discriminatory intent "if, at the very least, it also were shown
that roughly equivalent numbers of over-forty and under-forty
individuals applied for employment."  Other than a single
spreadsheet pertaining to the applicants for the NAP Class of
2002 (discussed below), the Court has been unable to identify any
statistics which show the number of *candidates* by race to the NAP
or to any other graduate program, the class with which Ms.
Sanders, as an applicant, must properly be compared.  Mere
conclusory allegations of generalized racial bias do not
establish the necessary discriminatory intent under § 1981.

22

Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992),
*citing* Village of Arlington Heights v. Metropolitan Hous. Dev.
Corp., 429 U.S. 252, 264-68 (1977).  Plaintiff's Memorandum of
Law is replete with such generalized allegations, but these are
unsupported by deposition testimony or affidavits of other
African-American applicants to the NAP – or to any other SON
graduate program – who claim to have been subjected to racial
discrimination in the admissions process.

As to discriminatory intent which the Individual Defendants
expressed against her personally, Ms. Sanders was unable at her
depositions to give examples of any such actions.  For example,
with regard to Ms. Rudy's role in the decision not to admit her
to the NAP, she stated, "I don't know what her role was."
(Plf.'s App. 3, Sanders Depo. at 409.)  When pressed, she stated,
"I think Ellen Rudy may have discriminated against me about my
race because of her anger or what ever her issues were with Rob
Ewell and that I was seen as a connection to Rob Ewell."  (Id. at
410.)  But she also admitted that Ms. Rudy had never made any
comments to her about Mr. Ewell and she had never heard that such
comments were made to others.  (Id. at 412.)  Similarly, when
asked to provide examples of discriminatory actions taken by Mr.
O'Donnell because of her race, Ms. Sanders stated, "I can't be
specific in all details how he did what he did.  All I know is
that the end result is where we are today," and that despite the
fact that "he never said anything per se discriminatory . . . to

me, I don't know what you could call it, but I know something
happened because the tone and text and everything from Mr.
O'Donnell changed." (Plf.'s App. 3, Sanders Depo. at 413, 419.)
She gave the same type of answer as to Ms. Jack's discriminatory
actions, that is, "I don't know in all ways how . . . Ms. Jack
discriminated against me. I know that something happened."
(Univ. Defs.' Memo, Exhibit E, excerpts from Sanders Depo. at
424.) She was unable to report any discriminatory remark Ms.
Jack made about or to her and did not provide evidence that would
refute Mr. O'Donnell's sworn statement that Ms. Jack did not have
a decision-making role in the NAP admissions process. (Univ.
Defs.' Memo, Exhibit A, Affidavit of John O'Donnell, ¶ 18.)
Finally, Plaintiff has not produced any evidence to refute Mr.
Clochesy's statements that he did not play any role in the
admissions process for the NAP, that he did not discuss her
application with Ms. Jack or any other SON administrator, and
that after he left the University of Pittsburgh in July 1999
(seven months before the decision about Ms. Sanders' admission
was made), he had very little contact with anyone at the
University. (Univ. Defs.' Memo, Exhibit E, excerpts from
deposition of John M. Clochesy, at 84, 91, 99.) Vague and
speculative statements that "something happened" to negatively
affect her admission to the NAP do not provide the necessary
evidence to allow Plaintiff to avoid summary judgment.

    With regard to Plaintiff's more explicit claim that she was

discriminated against because NAP administrators denied her application even though she was "comparable to or more qualified than some white students who were admitted," one need only consider the admissions data for the Class of 2002 to understand why she has failed to show that she was treated less favorably than similarly situated Caucasian applicants.

According to University Defendants, a spreadsheet was compiled by an employee of the SON, listing 28 applicants admitted on a full- or -part-time basis to the NAP Class of 2002; another eight were admitted from this round of interviews to the Class of 2003, for a total of 36. (Plf.'s App. 3, Exhibit 25A, Deposition of John O'Donnell, December 17, 2003, "O'Donnell 12/17/03," Depo. Exh. 50.[8])  The spreadsheet also includes information about a total of 32 candidates whose applications were placed on a waiting list, deferred, "on hold," incomplete, or withdrawn.  Finally, there is a list of 42 candidates, including Ms. Sanders, whose applications were rejected.[9]

Of the 110 total applicants, 104 were Caucasian. Of the 36 candidates admitted to the Class of 2002 or 2003, 35 were Caucasian; of the 42 candidates rejected, 39 were Caucasian, two

---

[8]  The most complete set of spreadsheets and individual evaluation forms are provided as exhibits to the deposition testimony of Mr. O'Donnell.  References to "Depo. Exh." in this section of the opinion relating to the admissions data therefore pertain to O'Donnell 12/17/03 unless otherwise noted.

[9]  Some of these applications were also marked deferred, on hold, or withdrawn but they were all initially in the "rejected" category.

were Hispanic and one (Ms. Sanders) was African-American.  The
GRE scores of rejected Caucasian applicants ranged from 1940 to
1180 and their professional experience was as much as 19 years.
(Depo. Exh. 50.)

Applicants to the NAP were evaluated on six criteria, each
worth a pre-established number of points.  In the case of the
quality grade point average ("QPA") and standardized test scores,
the number of points earned was entirely objective; that is,
points were awarded based on pre-determined break-points on a
scale.  According to the spreadsheet summary, the lowest score
with which a candidate was admitted to the Class of 2002 was 18.
The average candidate admitted to that Class received a total of
21 points out of a possible 24, including 6 for his or her QPA, 5
for the GRE score or, alternatively, 4 for the MAT score.

The average successful candidate also had almost five years
of professional experience, giving her 2 points in that category.
(Depo. Exh. 50.)  Plaintiff admits that at the time she was
interviewed for the NAP, she had spent only two days providing
actual patient-related care in a critical care environment.
(Plf.'s Aff., ¶40.)  However, like other candidates who had not
yet completed a year's work in an intensive or critical care
unit, Ms. Sanders was given the "professional courtesy" of
assuming she would complete that requirement before she began
full-time study. (O'Donnell 12/21/03 at 308.)

26

| Candidate | Total Points | QPA 7 points | GRE or MAT 6 points | Interview[10] 6 points | References[11] 1 point | Essay[12] 2 points | Professional Experience[13] 2 points |
|---|---|---|---|---|---|---|---|
| **Sanders** (theoretical) | 14.5 16.5 | 6 | 1 (GRE) 3 (MAT) | 3.5 | 1 | 2 | 1 |
| Applicant 23 | 19 | 7 | 4 (MAT) | 3 | 1 | 2 | 2 |
| Applicant 4 | 20 | 7 | 3 (MAT) | 5 | 1 | 2 | 2 |
| Kuchinski | 19 | 6 | 5 (GRE) | 3 | 1 | 2 | 2 |
| Applicant 13 | 20 | 4 | 6 (GRE) | 5 | 1 | 2 | 2 |
| Applicant 15 | 21 | 7 | 6 (GRE) | 5.5 | 1 | 0 | 1.5 |

A review of the data compiled by the University shows no
evidence to support Ms. Sanders' assertion that her application
was rejected solely on the basis of her GRE test score.  Her
total score, including one point for her GRE, was 14.5.  Plaintiff

---

[10] Candidates were ranked outstanding, very strong, strong, very
good, good, fair or poor.  Mr. O'Donnell conceded that this was a
subjective evaluation on the part of the interviewers.  (O'Donnell
2/21/03 at 110.)

[11] A rating of 1 indicated "clearly recommended;" 0 indicated "not
recommended."

[12]  The essay was scored according to specific albeit subjective
requirements:  (1) clear statement of nursing philosophy; (2)
articulated reasons for studying area of specialization; (3) realistic
expectations of master's program; (4) statement of appropriate career
goals; (5) synthesis of above into a coherent whole; and (6) legible,
correct grammar and spelling.  An essay which met all these criteria
was awarded 2 points; 1 point was awarded if the essay met 4 or 5 of
the criteria; no points were awarded for an essay which satisfied 3
criteria or fewer.

[13] The criteria here were human service orientation, goal setting,
commitment to nursing, membership in nursing organizations, evidence
of leadership in nursing, and nursing experience.  Two points were
awarded for satisfying 5 or 6 criteria; 1 point for 3 or 4 criteria;
and no points for 2 or fewer criteria.  One year's experience in a
critical care unit within the five years prior to admission was a
subset of this category.  (O'Donnell 2/21/03 at 135.)

argues that had her MAT score of 49 been considered instead of her GRE, she would have received 3 points instead of 1, for a total score of 16.5 points (referred to herein as the "theoretical total.") But even if she had been awarded 3 points for her MAT score, she would still have received 1.5 points fewer than the score of the lowest admitted candidate.

To support her claim that she was "comparable to or more qualified than some white students who were admitted," Ms. Sanders identified five specific Caucasian candidates as comparators.  A plaintiff "does not create an issue of fact merely by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her."  Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).  However, even given this latitude, Plaintiff has failed to establish her claim that she was at least as well qualified as those selected.

The evaluation forms identified as 23-1 and 23-2 both pertain to the same candidate.  Ms. Sanders claims that this applicant received preferential treatment because Mr. O'Donnell admitted "tampering" with her evaluation form.  Plaintiff argues that "in sharp contrast" to the way she was treated, Mr. O'Donnell gave this Caucasian applicant credit for her MAT score and offered her contingent part-time admission.  (Plf.'s Opp. to Univ. Mot. at 24-25.)

On the evaluation form identified as 23-1 (Depo. Exh. 60-K),

a handwritten note indicates, "Admission contingent upon completion of [statistics course] prerequisite and submission of GRE scores.  Ongoing status contingent upon success within graduate course work."  The evaluation form identified as 23-2 (Depo. Exh. 60-L) is identical in all respects except that the handwritten note indicates, "[Part-time] status contingent upon approved [statistics] course; [full-time] acceptance contingent upon [part-time] success."  (O'Donnell 12/17/03 at 77.)  Mr. O'Donnell explained that he created the form shown as Depo. Exh. 60-K to replace the one prepared by the evaluation committee because there was no requirement on the first version that the candidate take the GRE.  (O'Donnell 12/17/03 at 74-75.)

Contrary to Ms. Sanders' contention that she was more highly qualified than this candidate, Applicant 23 earned 7 points for her QPA as compared to 6 for Ms. Sanders.  In addition, she received 2 professional experience points, in part for having completed 17 years of nursing, including approximately 2 years in an ICU.  The change in the content of the handwritten note, if anything, increases the burden on Applicant 23 by making admission contingent on taking the GRE.  Thus, this Caucasian candidate was given exactly the same requirement as Plaintiff  – submit competitive GRE scores prior to admission.[14]

---

[14]  According to Mr. O'Donnell, this candidate withdrew when she learned that she would be required to take a statistics course as well as the GRE and would not be admitted with her MAT score.  (O'Donnell 12/17/03 at 76-77.)

Ms. Sanders' second comparator is Applicant 4 (Depo. Exh. 51-C) who received 2 points for 12 years' experience as an intensive care unit nurse and 7 points for a QPA higher than 3.5. She had taken the MAT and scored only 41, below Plaintiff's score, but also in the range worth three points.  Plaintiff claims her MAT score was converted to an equivalent GRE score, an accommodation which was not made for her.  (Plf.'s Opp. to Univ. Mot. at 26.)  This argument is irrelevant.  Unlike Plaintiff, Applicant 4 did not need to take either of the standardized tests because, according to the NAP guidelines and the evaluation form, a candidate like Applicant 4 who already had a masters degree in a relevant nursing discipline was not required to submit standardized test scores. (O'Donnell 2/21/03, Depo. Exh. 6.) Without points for either test, her total score of 17 would have been sufficient for admission to full status according to the range on the evaluation form.  Based on experience and education alone, this applicant cannot be considered similarly situated to Ms. Sanders.

Plaintiff's third comparator is Angela Kuchinski who received a total of 19 points, including 5 for a GRE score of 1510.  (Depo. Exh. 55.)  Ms. Sanders argues that she was discriminated against because this candidate's GRE scores were "enhanced."  (Plf.'s Opp. to Univ. Mot. at 26-27.) That is, Ms. Kuchinski had taken the GRE on at least seven occasions.  In determining the number of points to be awarded for her GRE score,

the highest scores in each of the three sections of the exam had been added together from tests taken on different dates, rather than using the scores from only one exam. (Depo. Exh. 53.) Mr. O'Donnell claimed that he did not know this had happened when the admissions decision was made. (O'Donnell 12/17/03 at 53.) According to the summary of scores from all the GRE tests Ms. Kuchinski had taken, the highest score she received on a single exam was 1370, which would have given her 4 points rather than 5 and a total of 18, still higher than Plaintiff's theoretical score.[15] As University Defendants point out, had Ms. Sanders taken the GRE multiple times and not been given the advantage of using her highest scores in each section as was done for Ms. Kuchinski, she would have grounds for claiming that she had been treated disparately, but that is not the case inasmuch as she took the exam only once. (Univ. Defs.' Reply at 13.)

Applicant Exhibit 13 (Depo. Exh. 58-L) received a total score of 20, including 6 points for a GRE score of 1750 and 2 professional experience points for more than two years' work in an intensive care environment. One area in which she scored lower than Ms. Sanders was her QPA where she received 4 points to Ms. Sanders' 5. Plaintiff argues that Applicant 13 received preferential treatment because her undergraduate QPA (which was lower than Plaintiff's) was not used in calculating her total

---

[15] Plaintiff's statement that a score of 1370 on the GRE was worth only three points (Plf.'s Opp. to Univ. Mot. at 27) is simply erroneous, according to the evaluation form.

score.  (Plf.'s Opp. to Univ. Mot. at 34.)  However, that contention simply cannot be correct because according to the information on the evaluation form, Applicant 13 would have received 7 points for her much higher QPA in her nursing courses.

Plaintiff's last argument regarding the NAP admissions process is that certain candidates with QPAs lower than hers were "moved into competitiveness" when they were given high interview scores as "an undetectable way to admit favored white applicants who might not otherwise be admitted." (Plf.'s Opp. to Univ. Mot. at 33.)  She claims that this reflects a bias among the interviewers for Caucasian applicants.  This argument is first refuted by the fact that two of her chosen comparators, Applicant 23 and Ms. Kuchinski, received lower interview scores than she but still scored higher overall.  It is also refuted by analyzing the one of the comparators[16] proposed by Plaintiff, Applicant 15. Plaintiff contends this person was admitted even though she did not score well on the essay or in the professional experience category because she was given 5.5 out of 6 points for her interview.  (Id. at 33-34.)  Applicant 15 had a QPA of 3.956 and scored 1740 on her GRE.  (Depo. Exh. 58-N.)  While it is true she received no points for her essay, the evaluation form shows that her native language was Russian.  Even if she had received the

---

[16]  Plaintiff identifies two other comparators in this class, Depo. Exhs. 58-W and 51-N, but the only argument she offers in their regard is speculation that "the interview pushed" them into admission. (Plf.'s Opp. to Univ. Mot. at 33-34.)

same interview score as Plaintiff, i.e., if her interview score had not been increased due to racial bias as Plaintiff alleges, her total of 19 would still have exceeded that of Plaintiff.

In conclusion, a review of the candidates for the Class of 2002, including the specific comparators Ms. Sanders has chosen, shows that each of them outscored her even if she had been given credit for her MAT score instead of her GRE.  The Court agrees with Defendants that Ms. Sanders cannot establish that she was discriminated against by being denied entrance to the NAP because the evidence shows conclusively that she was not as qualified for the program as the candidates who were accepted.  (Univ. Defs.' Memo at 13.)  As the Supreme Court has held, a plaintiff who fails to satisfy neutral admissions criteria does not have standing to state a claim warranting recovery.  <u>Texas v. LeSage</u>, 528 U.S. 18, 21 (1999) ("Simply put, where a plaintiff challenges a discrete . . . decision as being based on an impermissible criterion and it is undisputed that the [defendant] would have made the same decision regardless, there is no cognizable injury warranting relief.")  Summary judgment is granted to University Defendants as to Count I.

> 2.    *Count II – Racial Discrimination in Violation of Title VI*

In Count II, Plaintiff claims that by the actions described in Count I, the University and the School of Nursing violated 42 U.S.C. § 2000d ("Title VI"), which provides that "No

33

person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Plaintiff argues again that Mr. O'Donnell "deliberately misused the GRE" by making it the "sole criterion for denial of admission," (Plf.'s Opp. to Univ. Mot. at 29), but there is no evidence to support this argument.  If this had been the case, any applicant who did not take the GRE would not have been considered for admission, and the record shows that at least five candidates, including Ms. Sanders, were evaluated.  (O'Donnell 12/17/03, Depo. Exh. 50.)  Nor is there any evidence to support her implication that in a continuing effort to prevent her admission to the program (Plf.'s Opp. to Univ. Mot. at 28), the SON faculty decided in February-March 2000 to change its admissions criteria for the NAP, eliminating the MAT option entirely.  (O'Donnell 2/21/03 Depo. Exhs. 26 and 27.)  By March 2000, Ms. Sanders had already been rejected for the Class of 2002, there is no evidence to show that she requested to be considered in the Fall of 2000 for the Class of 2003, and she did not pursue her application to the NAP after she received the June 18, 2001 letter regarding her status at that time.  Therefore, any change in the admissions requirements did not affect her. However, we must consider her third argument, that is, SON faculty, in particular Mr. O'Donnell, knew that African-American

34

applicants were far more likely to receive lower scores on the GRE than Caucasian candidates and negligently or intentionally ignored this information in making admissions decisions.  (Plf.'s Opp. to Univ. Mot. at 29-30.)

A Title VI cause of action must be asserted against the entity receiving the federal funds, and not against individuals. *See* Buchanan v. City of Bolivar, 99 F.3d 1352, 1356 (6th Cir. 1996).  The University concedes without discussion the School of Nursing's receipt of federal financial assistance and thus acknowledges that Title VI applies to its programs.  The motion for summary judgment on this Count rests on the argument that Plaintiff cannot show that SON acted with the necessary intentional discrimination, i.e., that she was excluded from the NAP "because of" her race.  (Univ. Defs.' Mot. at 3.)

The Supreme Court has held that the section of Title VI on which Plaintiff rests her case "reaches only instances of intentional discrimination."  Alexander v. Sandoval, 532 U.S. 275, 280-281 (2001).  Claims arising under Title VI are also analyzed using the McDonnell Douglas paradigm.  NAACP v. Med. Ctr., Inc., 657 F.2d 1322, 1333 (3d Cir. 1981) (*en banc*.)

As shown above, Ms. Sanders failed to establish that she was as qualified as other candidates to NAP; following the same analysis here, a Title VI claim based on disparate treatment must fail.  On the other hand, if Plaintiff's Title VI claim is interpreted as alleging disparate impact based on the fact that

the SON chose to rely on admissions criteria that worked to the disadvantage of African-American candidates (i.e., use of the GRE rather than MAT and subjective personal interviews), that claim also fails.  As the Supreme Court recently reiterated in Jackson v. Birmingham Bd. of Educ., ___ U.S. ___, 125 S. Ct. 1497, 1506 (2005), "Sandoval held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination." See also, S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 274 F.3d 771, 790-791 (3d Cir. 2001), cert. denied, 536 U.S. 939 (2002) ("it is clear that, particularly in light of Sandoval, Congress did not intend by adoption of Title VI to create a federal right to be free from disparate impact discrimination"), and Guardians Assn. v. Civil Service Comm'n of New York City, 463 U.S. 582 (1983) (the complex determination of which disparate impacts upon minorities constituted readily remediable social problems significant enough to require altering the practices of federal grantees was delegated to the same agencies charged with implementing the act, not to individuals.)

Moreover, unless it can be shown that evaluations of professional qualifications "have been used as [a] mechanism to obscure discrimination, they must be left for evaluation by the professionals." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992) (citations and internal quotations

omitted), *cert. denied*, 510 U.S. 826 (1993).  The Third Circuit
has indicated that it will not second-guess an educational
institution's application of its own academic standards and
procedures, whether they pertain to tenure, promotion, grants,
termination of fellowships or scholarships, judgments as to the
academic performance of students, or other internal decisions
regarding academic qualifications.  Hankins v. Temple Univ., 829
F.2d 437, 443 (3d Cir. 1987) ("University faculties . . . must
have the widest discretion in making judgments as to the academic
performance of their students"); Molthan v. Temple Univ., 778
F.2d 955, 962 (3d Cir. 1985).  One must conclude that a
preference for one standardized admissions test over another is
an internal decision regarding academic qualifications best left
to the University.  Summary judgment in favor of the University
will therefore be granted as to Count II.

> 3.   *Count III – Violation of Plaintiff's First
>      Amendment Right of Association Pursuant to § 1983*

In her Second Amended Complaint, Ms. Sanders
alleges that "at some point in or around the spring of 1999,
Defendant Clochesy, who was a close associate with [sic] Dean
Rudy, advised others on the staff, to keep an eye on Plaintiff
because Ewell would be suing the school and that she was a
troublesome student." (Compl., ¶ 222.)  Plaintiff states that
Defendants Rudy and Clochesy knew of her association with Mr.
Ewell because she had attended SON social events with him and

that she "was seen as a troublemaker by Defendants by virtue of
her close personal relationship with Robbi Ewell."  (Compl.,
¶¶ 225-226.)  She further alleges that the Individual Defendants
"conspired to deter [her] from applying to NAP and rejected her
application as a result of her race and/or to retaliate and
violate her freedom of association because of her relationship
with Robbi Ewell and/or to deter her relationship with Ewell or
others who had complaints of racial discrimination."  (Id., ¶
229.)  Finally, Ms. Sanders contends that the School of Nursing
tried to "impede [her] from graduating and seeking admission into
NAP and then refus[ed] to admit her into NAP in retaliation of
[sic] her association with Ewell and their [sic] perception that
she supported his race discrimination claim and would be a
witness for him."  (Id., ¶ 230.)

     According to Plaintiff, she and Mr. Ewell, a SON faculty
member and Ph.D. candidate, began a long-term relationship in
1994.  Mr. Ewell was one of only three or four African-American
faculty members in the School of Nursing and an outspoken critic
of what he perceived as a lack of racial diversity there.  Except
for a brief period from July 2000 through July 2001 when Mr.
Ewell was employed in Cincinnati, the two lived together in Mr.
Ewell's home in Pittsburgh.  (Plf.'s Opp. to Univ. Mot. at 3.)
According to Plaintiff, Ms. Rudy was "extremely angry" with Mr.
Ewell because of his EEOC complaint and "became threatening"
against others who supported him.  (Compl., ¶¶ 223-224.)

University Defendants argue that Plaintiff has failed to show that she and Mr. Ewell participated in an "intimate relationship" of the type protected by the Constitution.  (Univ. Defs.' Memo at 28-32.)  This argument need not be addressed in detail because Ms. Sanders fails to show that anyone affiliated with the SON interfered with her relationship with Mr. Ewell.

The Supreme Court has recognized two types of constitutionally protected freedom of association.  The first includes the right to associate with others to engage in activities in pursuit of a "wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984).  The second includes the fundamental liberty right to enter into intimate relationships, for example, marriage, which involve "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." Jaycees, id. at 620.  Contrary to University Defendants' contention that the lack of a legally recognized marriage between Plaintiff and Mr. Ewell takes their relationship outside the realm of protected intimacy, as the Court in Jaycees explained, "a broad range of human relationships . . . may make greater or lesser claims to constitutional protection," thus requiring the court to make "a careful assessment of where [a particular] relationship's objective

characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." Id. at 620.

Assuming for the sake of argument that the relationship between Plaintiff and Mr. Ewell was an "intimate association" of the type protected by the First Amendment, there is no evidence to support Plaintiff's claims that any University Defendant interfered with this relationship. In fact, at her deposition, the following exchange took place:

> Q:   Did anyone at Pitt ever attempt to stop you from associating with Mr. Ewell, [did] anybody suggest that you should stop associating with him?

> A:   No one suggested that I stop associating with him.

(Plf.'s App. 3, Sanders Depo. at 406-407.)

Plaintiff's First Amendment argument is misplaced because the intimate relationship doctrine protects the relationship and her freedom to enter into it, not her rights arising from other constitutional provisions such as the equal protection of the Fourteenth Amendment or her right of free speech which could have been implicated had Ms. Sanders testified or otherwise overtly supported Mr. Ewell's EEOC claim. Ms. Sanders does not allege that the University attempted to interfere with her First Amendment right to free speech, that is, her right to support Mr. Ewell in his discrimination claim against the University. Moreover, to the extent Plaintiff argues that the University sought to "deter her relationship with . . . others who had complained of racial discrimination" (Compl., ¶ 229), nothing in

40

the record supports this claim.  In her memorandum opposing the University Defendants' motion for summary judgment, Ms. Sanders addresses at length the relationships among African-American employees at the SON and their relationships with Mr. Ewell, but gives not one example of how anyone in the School interfered with *her* relationship with anyone.  (Plf.'s Opp. to Univ. Mot. at 38-43.)  Both Samuel Ward and Joseph Brun, African-American employees of the SON, testified that they knew Ms. Sanders as a student and as Mr. Ewell's girlfriend, but according to the extensive deposition excerpts provided by Plaintiff, neither testified that the University discouraged them in any way from associating with either Mr. Ewell or Ms. Sanders.  (Plaintiff's Appendix to Brief in Opposition to Defendants' Motions for Summary Judgment and Partial Summary Judgment, Vol. 4, Docket No. 104, "Plf.'s App. 4," Exhibit 33, Deposition of Samuel E. Ward; Plf.'s App. 2, Exhibit 13, Deposition of Joseph Brun.)

Similarly, there is no evidence that the University made admissions decision based on the possibility that she would be a witness for Mr. Ewell in his EEOC claim against the SON.  One need only consider the chronology of events to understand why this claim must fail.

Mr. Ewell's attorney first wrote to the University on April 27, 1998, complaining of racial discrimination.  (Plf.'s App. 1, Exhibit 5, Affidavit of Robbi Ewell, "Ewell Aff.," ¶ 8 and Aff. Exh. 2.)  Ms. Sanders was still completing her undergraduate

requirements at this time and did not begin the NAP applications
process until later in the year.  In early January 1999, Mr.
Ewell began the internal university appeal process (Ewell Aff.,
¶ 11), just about the same time Ms. Sanders received an e-mail
from Mr. O'Donnell on January 12, 1999, encouraging her NAP
application and stating, "I think it is terrific that you are
moving forward with your goal."  (O'Donnell 2/21/03, Depo. Exh.
13.)  Although she was not considered for the Class of 2001, Ms.
Jack wrote to her on August 3, 1999, advising her on ways to
improve her chances for acceptance to the Class of 2002.  Mr.
Ewell filed information with the EEOC on October 8, 1999 (Ewell
Aff., ¶ 8); Mr. O'Donnell invited her for an interview on October
27, only a few days later.  She was interviewed on December 17
while the University was still conducting its internal review of
Mr. Ewell's claim.  There is no evidence that the three SON
faculty members who interviewed Ms. Sanders were aware of the
claim filed by Mr. Ewell or of her relationship with him.  She
was rejected by letter of January 25, 2000; his University appeal
was not concluded until February 1, 2000, when the review
committee decided in his favor, suggesting that the decision to
terminate his contract be reconsidered.  (Ewell Aff. Exh. 3.)
Ms. Sanders and Mr. O'Donnell were still discussing her candidacy
for the NAP on April 9, 2001, before the EEOC issued its findings
on April 17, 2001.  (Ewell Supp. Aff., unnumbered exhibit.)  In
short, there is no evidence to show that the University

42

Defendants either discouraged her application, treated her
negatively because of her relationship with Mr. Ewell, or made
decisions regarding her application in retaliation for events
which were occurring with regard to his discrimination claims.

A party opposing summary judgment must come forth with more
than pure speculation in support of her claims and must do more
than simply show that "there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus., 475 U.S. at 586.
Given that Plaintiff has not come forth with any evidence that
University Defendants took any action against her because of her
relationship with Mr. Ewell, or interfered with that relationship
in any way, summary judgment is granted as to Count III.

4.    *Count V – Conspiracy in
      Violation of 42 U.S.C. § 1985(3)*

Plaintiff claims in Count V that the School of
Nursing and the Individual Defendants conspired to denigrate her
and create "an adverse impression of her at her place of
employment and her employment opportunities because of her
association with Ewell who had raised claims against Clochesy and
Rudy of race discrimination and because of her race." She further
alleges that "SON and the Individual Defendants conspired to
single out Plaintiff with various representatives and/or
employees of UPMC, all of which acted to result or play a
motivating role in her termination from employment at UPMC
Shadyside." As a result of this conspiracy, Plaintiff was
"subjected to delays in hiring, failure to properly train and

ultimately termination." (Compl., ¶¶ 241-244.)

Plaintiff brings this claim under 42 U.S.C. § 1985,[17] and therefore must show that (1) two or more persons conspired to deprive her of the equal protection of the law; (2) one or more of the conspirators performed (or caused to be performed) an overt act in furtherance of the conspiracy; and (3) that the overt act injured Plaintiff in her person or property or deprived her of any right or privilege of a citizen of the United States. Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 162 (3d Cir. 2001), citing Griffin v. Breckenridge, 403 U.S. 88, 102-103 (1971).

University Defendants argue that not only is the Section 1985(3) claim barred by the "intra-corporate conspiracy doctrine," but that Ms. Sanders has failed to factually support this claim. (Univ. Defs.' Memo at 36-38.)  Although none of the UPMC Defendants is named as a co-conspirator, they have also addressed this Count because they believe the language of the Second Amended Complaint and of Ms. Sanders' memoranda in opposition to the motions for summary judgment appears to

---

[17] Section 1985(3) provides in relevant part: "If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . . [or] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

implicate them as well.  (Brief in Support of Motion of UPMC Shadyside for Partial Summary Adjudication as to Counts IV, VII and VIII and for Summary Judgment as to Count IX, and of Defendants UPMC Health System and UPMC Presbyterian for Summary Judgment, Docket No. 90, "UPMC Brief," at 17-18, *citing*, for example, the Second Amended Complaint, ¶ 243, which alleges that SON and the Individual Defendants "conspired with various representatives and/or employees of UPMC.")  We need not address the intra-corporate conspiracy doctrine argument because Plaintiff has failed to show the existence of a conspiracy.

Ms. Sanders discusses at length "unrebutted circumstantial evidence of a conspiracy" concerning her treatment at Shadyside, "based on the timing of events and the close relationship between UPMC and SON."  (Plf.'s Opp. to Univ. Mot. at 38-40.)  Plaintiff admitted at her deposition that discovery had not revealed any written communication between officials at SON and UPMC directly regarding her employment.  (UPMC App., Sanders Depo. at 70.)  However, she argues that two notes or e-mail messages give rise to the inference that officials from the two organizations discussed her.  Ms. Sanders stated at her deposition that one such message suggested that "someone contact the school of nursing regarding my references;" the second "questioned my presence, regarding my e-mail address, that in it is outlined the word Pitt and someone wanted to know more about that."  From these instances, Ms. Sanders inferred that the messages were

"regarding me or my employment or connecting me with the school
of nursing" and that "someone [was] communicating and giving
information back and forth." (UPMC App., Sanders Depo. at 74-
75.) However, Ms. Sanders did not explain how checking on her
references and questioning her e-mail address reflect a
"conspiracy" to adversely affect her employment at Shadyside.
Nor could she identify any individuals at the SON who responded
to those messages, influenced how she would be treated at
Shadyside, or participated in decision-making related to her
employment. (Id. at 75-76.)

In support of her conspiracy claim, Plaintiff cites the
following facts which establish "a closely knit nursing community
between UPMC and SON:"

> Judy Jim, a nurse-recruiter at Shadyside,
> attended job fairs at SON;
>
> Ms. Jim gave presentations to NAP
> interviewees who wished to work at critical
> care units within the UPMC Health System; and
>
> Mr. O'Donnell referred students to Ms. Jim
> for placement.

(Plf.'s Opp. to Univ. Mot. at 8.)

Plaintiff provides further circumstantial evidence of
"suspicious events at UPMC" which "mirrored events at SON:"

> Mr. Ewell's claim of discrimination made in
> the spring and summer of 1999 involved "top
> officials at SON who were closely allied with
> top officials at UPMC;" and
>
> Ms. Rudy met monthly with Ms. Merryman, vice
> president for clinical operations at
> Shadyside, and with Ms. Wolf, chief nursing

     officer of UPMC who was also an Associate
     Dean at SON.

(Plf.'s Opp. to UPMC Mot. at 39.)

  In sum, Plaintiff claims,

    given the unusual events at Shadyside, it is not
    difficult to infer that the talkative Rudy mentioned
    something about Ewell and/or Sanders both of whom staff
    at Shadyside knew and knew of their relationship. . . .
    All it would take was a comment from Rudy to Wolf or
    Merryman or anyone of the other closely associated
    employees between SON and UPMC to see Sanders as a
    black troublemaker living with another black
    troublemaker in what was, in essence, a segregated
    community.

(Plf.'s Opp. to UPMC Mot. at 40.)

  This "unrebutted evidence" does nothing more than establish

that (1) SON faculty interacted with the staff of UPMC for the

mutually beneficial purposes of training and placement, and (2)

senior officials of the organizations had regular professional

interactions with each other.  As the Court of Appeals pointed

out in Barnes Foundation, "the First Amendment requires more than

evidence of association to impose liability for conspiracy and,

in fact, prohibits liability on that basis alone."  Barnes

Foundation, 242 F.3d at 163, citing NAACP v. Claiborne Hardware

Co., 458 U.S. 886, 918-19 (1982), and Pfizer Inc. v. Giles (In re

Asbestos School Litigation), 46 F.3d 1284, 1289 (3d Cir. 1994).

  There is no evidence to establish, as Plaintiff alleges,

that the University Defendants conspired among themselves to

negatively affect her employment at Shadyside.  In fact, even if

the conspiracy claim did include employees of Shadyside, the only

persons named are Ms. Jim, a nurse-recruiter who, the evidence shows, was not involved with her termination or the purportedly discriminatory treatment on the Med/Surg or Neuro ICUs, and Ms. Wolf and Ms. Merryman who were not involved in the termination decision except that Shadyside policy required that they be consulted and/or approve employment decisions involving nursing staff.  (Plf.'s App. 4, Exhibit 31, Deposition of Margaret Sweeney, "Sweeney Depo.," Depo. Exh. 23; Exhibit 32, Deposition of Marilyn Walters, "Walters Depo.," at 89.)  Plaintiff admitted at her deposition that the only people at Shadyside involved in decisions about her employment who were aware of her relationship with Mr. Ewell were Ms. Nelson and Ms. Smith because she had told them herself about that relationship.  (Plf.'s App. 3, Sanders Depo. at 46-50.)

One cannot withstand summary judgment based solely on speculation such as "it is not difficult to infer that the talkative Rudy mentioned something about Ewell and/or Sanders," or that "all it would take was a comment from Rudy to Wolf or Merryman and that was it." As noted in Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990), "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."

Summary judgment will be granted to University Defendants on Count V inasmuch as Plaintiff has failed to establish the

existence of a conspiracy, either among University Defendants or between University Defendants and UPMC Defendants, for the purpose of affecting her employment at Shadyside.

     5.    *Count VI – Failure to Prevent Conspiracy in Violation of 42 U.S.C. § 1986*

In Count VI, Plaintiff alleges that Defendants University of Pittsburgh, Rudy and Clochesy were negligent for failing to prevent the conspiracy alleged in Count V, thereby violating 42 U.S.C. § 1986.[18]  (Compl., ¶¶ 246-249.)

On its face, Section 1986 requires a colorable claim under § 1985 as a precedent to a claim under § 1986.  *See* Owens-El v. City of Pittsburgh, No. 04-1344, 2005 U.S. App. LEXIS 10686, *5 (3d Cir. June 8, 2005) (unpublished), noting that where there was insufficient evidence to support a Section 1985 claim, by definition, the evidence was not sufficient to support a Section 1986 claim; *see also* Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994).  Because as noted above, Plaintiff has failed to establish any conspiracy affect her employment at Shadyside, her Section 1986 necessarily must fail.  Summary judgment will be granted in Defendants' favor as to Count VI.

---

[18]  "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented."  42 U.S.C. § 1986.

B.   Claims against UPMC Health System,
     UPMC Shadyside and UPMC Presbyterian[19]

     1.   *Count IV – Racial Discrimination and*
          *Retaliation in Violation of 42 U.S.C. § 1981*[20]

          In Count IV, Plaintiff complains that UPMC

Shadyside treated her in a disparate fashion from how it treated

newly hired Caucasian nurses and terminated her employment based

on race and retaliation in contravention of 42 U.S.C. § 1981.

(Compl., ¶ 234.)  She further alleges that UPMC officials "knew

that [she] was associated with Ewell. . . including issues

involving Rudy and Clochesy who had close associations at UPMC

Shadyside and that not only was Plaintiff a highly visible

minority but was seen as one who would cause trouble."  (Id.,

¶ 235.)  This allegation has already been addressed above in the

---

[19]   Because we conclude that each claim against UPMC Defendants
fails on its merits, we need not consider their threshold argument
that UPMC Health System and UPMC Presbyterian must be dismissed
inasmuch as they did not play any role in the events surrounding Ms.
Sanders' employment at UPMC Shadyside.  (UPMC Brief at 15-16.)  We do
point out, however, that Defendants' "single employer" analysis may be
insufficient in light of the 3-part disjunctive test set out in Nesbit
v. Gears Unlimited, Inc., 347 F.3d 72, 84 et seq. (3d Cir. 2003).

[20]   Shadyside initially opposed the claims brought under Count IV
related to events occurring prior to October 2, 1999, on the basis of
the two-year statute of limitations applied by Pennsylvania courts to
Section 1981 claims.  (UPMC Mot. at 2.)  The Supreme Court held in
Jones v. Donnelley & Sons Co., 541 U.S. 369 (2004), however, that the
four-year statute of limitations established by Congress in 28 U.S.C.
§ 1658 applied to any federal statute enacted after December 1, 1990,
if the statute created new rights of action and did not establish an
explicit limitations period within itself.  In 1991, 42 U.S.C. § 1981
was amended by redefining the phrase "make and enforce contracts" such
that the plaintiffs' claims of hostile work environment, wrongful
termination, and failure-to-transfer in Jones could proceed, although
they would have been precluded under previous cases interpreting the
scope of § 1981.  Id. at 651.  Shadyside subsequently withdrew its
statute of limitations argument as to Count IV.

discussion of the conspiracy claim and will not be revisited.
Finally, Plaintiff alleges that UPMC ignored her complaints when
she was assigned to work under the supervision of a nurse's
assistant and terminated her in retaliation when she objected to
this treatment.  (Id., ¶¶ 236-237.)  This claim will be discussed
below with the other claims of retaliation.

It is well established in the Third Circuit that racial
discrimination claims brought under 42 U.S.C. § 1981 and Title
VII are also analyzed under the McDonnell Douglas shifting burden
paradigm.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 915 n.5
(3d Cir. 1983) (the two claims require "the same elements of
proof.")  Ms. Sanders relies on the same allegations to support
her Title VII racial discrimination claims[21] and her claims under
Section 1981; therefore, the analysis which follows applies to
both.  The Title VII "pattern and practice" claim, the age
discrimination claim, and the retaliation claims will be
discussed separately below.

To establish a claim for discriminatory discharge based on
race, the plaintiff must show that she: (1) is a member of a
protected class; (2) was qualified for the position; and (3) was
discharged under circumstances that give rise to an inference of

---

[21]  Section 703(a)(1) of Title VII of the Civil Rights Act of 1964
provides that "it shall be an unlawful employment practice for an
employer -- (1) . . . to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation,
terms, conditions, or privileges of employment, because of such
individual's race."  42 U.S.C. § 2000e-2(a)(1).

employment discrimination.  <u>Pivirotto</u>,191 F.3d at 352.  The

problem with Plaintiff's allegations of disparate treatment in

the termination decision and the events surrounding it is the

complete lack of evidence that she was qualified for the position

of emergency relief nurse in an intensive care environment.  In

fact, in the argument section of her memorandum of law, she never

addresses her qualifications, but simply relies on her argument

that she was terminated because of her race and in retaliation

for her complaints of discrimination to Ms. Smith.

Contemporaneous records from her preceptors and notes of the

progress meeting on August 2 all support Shadyside's conclusion

that Plaintiff was not qualified for her position.  For example,

Ms. Nelson wrote on July 22, 1999, that Ms. Sanders had not taken

a basic arrhythmia course in May and was unable to interpret a

patient's rhythm strip or identify a normal sinus rhythm.  Also,

despite having recently taken a class on the subject, she had "no

real working knowledge of how to do basic charting in the

computer."  (Plf.'s App. 2, Exhibit 2, Deposition of Moira

Nelson, "Nelson Depo.," Depo. Exh. 4.)  On July 24, 1999, Ms.

Nelson wrote,

> It was identified that Ms. Sanders had minimum
> knowledge/experience with [medication] administration
> and was unable to perform simple med calculations with
> maximum support.  She had to be given complete
> instruction and support on mixing, calculating and
> [administration.]

(Nelson Depo. Exh. 6.)

Following the August 2 progress meeting, Ms. Smith wrote to

Ms. Walters that Ms. Sweeney and Ms. Nelson had "grave concerns" about Plaintiff's progress, describing her as "good on paper, but weak in clinical practice," and noting, "if she doesn't demonstrate some clinical competency, it will be difficult to keep her in the ICU arena."  (Pelisari Depo. Exh. 3.)

Plaintiff does not come forward with evidence that Caucasian nurses who displayed these or comparable performance deficiencies during orientation were not terminated as she was.  The examples she does provide are of individuals not similarly situated.  For instance, Plaintiff refers to a Caucasian nurse who, like she, had difficulty with one of the orientation tests in July 2002, but had been allowed to work intermittently in the Med/Surg ICU from January 1997 to June 2000.  At some point she had made a racially derogatory allusion in front of a patient.  (Kotler Supp. Aff., ¶¶ 2-4.)  Ms. Sanders was not terminated solely because of her poor performance on the orientation test nor because of racial remarks she had made.  Plaintiff also refers (id., ¶¶ 5-6) to the evaluation of a Caucasian employee who made errors in transcription but was not terminated, which is again irrelevant to Plaintiff's situation.  She alludes to the fact that no disciplinary action was taken against Ms. Nelson after she committed an unspecified medical error (id., ¶¶ 5-6), again irrelevant because Defendants do not assert that was the reason for her termination.  Nor does Ms. Sanders establish that these situations occurred during the nurses' orientation periods.

The Court finds that Ms. Sanders has failed to establish that she was qualified for the position of emergency relief intensive care nurse and therefore has failed establish a *prima facie* case to support her claim of racial discrimination with regard to her termination.  Summary judgment is granted to UPMC Defendants on Count VI and Count VII insofar as the latter is based on disparate treatment.

2. *Count VII – Violation of Title VII through a Pattern and Practice of Discrimination*

In addition to the disparate treatment discussed above, Plaintiff claims that UPMC Health System and Shadyside violated Title VII by condoning a pattern and practice[22] of racially discriminatory employment actions, particularly against African-Americans.  (Compl., ¶¶ 252-258.)  UPMC Defendants argue that any pattern and practice allegations must be dismissed because such claims are not mentioned in her EEOC intake questionnaire or charge of discrimination; therefore Plaintiff failed to exhaust her EEOC administrative remedies with regard to this claim.  (UPMC Brief at 10.)  In response to Defendants' argument, Plaintiff offers only the passing comment that once the EEOC investigation began, her attorney tried three times to raise these issues by requesting that she be allowed to amend her

---

[22]  "Pattern and practice" cases require the plaintiff to show that the defendant had a policy, pattern, or practice of discriminating against a protected group, that is, the discrimination was "standard operating procedure, the regular rather than the unusual practice."  <u>Int'l Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 336 (1977).

complaint.  She offers as evidence letters from her attorney to the EEOC dated April 19, May 22, and June 21, 2002.  (Plf.'s Opp. to UPMC Mot. at 27.)

The Court has carefully reviewed these letters and concludes that at best, they make only vague allusions to a pattern and practice of discrimination.  Ms. Sanders' attorney wrote on April 19, 2002, that "we believe there is a pattern in practice [sic] of discrimination at UPMC hospitals as far as black nurses are concerned," but there is no evidence to support that assertion and no request to amend the EEOC charge.  (Kotler Supp. Aff. Exh. 14.)  The May 22, 2002 letter does not refer to a pattern and practice claim or to amending the EEOC charge.  (Kotler Supp. Aff. Exh. 15.)  The letter of June 21, 2002, while more extensive and detailed, makes only vague reference to beliefs by certain Shadyside employees that African-Americans were discriminated against (*see*, for example, at page 13, a reference to a Caucasian supervisor who purportedly considered African-American nurse's aides "troublemakers and lazy.")  The letter also includes a list of questions about employment statistics concerning African-American nurses at UPMC hospitals.  However, Plaintiff's counsel did not urge the EEOC to designate her charge as a pattern and practice claim as she now asserts.  (Kotler Supp. Aff. Exh. 16.) On the other hand, a letter to the EEOC dated July 1, 2002, which is not referenced by Plaintiff, does include a request by her attorney "that the EEOC amend [Plaintiff's] charge and/or

investigate it as part of a pattern and practice of race discrimination." (Kotler Supp. Aff. Exh. 17.)

None of these letters was copied to UPMC Defendants' counsel, thus, to the extent a pattern and practice claim could be construed therefrom, Defendants did not receive even informal notice of it. One of the purposes of the exhaustion requirement is to put the "employer on notice that a complaint has been lodged against him and [give] him the opportunity to take remedial action." Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 786 (W.D. Pa. 2000). Nor is there any evidence that the EEOC investigated such claims as falling within the scope of its proceedings on the age/race discrimination and retaliation claims. See Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996) (where specifics of the disability discrimination charge before the EEOC did not "fairly encompass" a claim of gender discrimination, the plaintiff's civil suit on the latter was barred for failure to exhaust administrative remedies.) Moreover, at her deposition, Ms. Sanders admitted that she had never worked at any UPMC hospital other than Shadyside and that she knew nothing about employment practices at any other facility in the UPMC Health System. (UPMC App., Sanders Depo. at 83.) Plaintiff's attorney concedes that Ms. Sanders' EEOC charge was never amended. (Kotler Supp. Aff., ¶ 15.)

To the extent Plaintiff has attempted to state a Title VII claim of pattern and practice discrimination by Shadyside or

throughout the UPMC Health System, that claim will be dismissed for failure to exhaust the administrative remedies of the EEOC as required by Title VII.

        3.   *Count VIII – Violation of the Age Discrimination in Employment Act*

Based on the same events described above in the racial discrimination claims, Ms. Sanders argues that the UPMC Defendants violated the ADEA.  In particular, Plaintiff claims that she was "stereotyped" because of her age; that supervisors and co-workers "focused on her distant past experience rather than her recent nursing education;" and that she was "reminded" of her age.  (Compl., ¶¶ 261-264.)  UPMC Defendants argue that this claim must be dismissed because there is nothing in the record to show that Ms. Sanders complained about age discrimination to any one at Shadyside, much less that the individuals who decided to terminate her employment were aware of such allegations.  (UPMC Brief at 14.)

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).  The protections of the ADEA are "limited to individuals who are at least 40 years of age" (id.) and thus apply to Plaintiff who was 43 years old when she was employed by Shadyside.  To state a *prima facie* case of age discrimination under the ADEA, a plaintiff must establish that she: (1) was over

40 years of age; (2) was qualified for the position in question; (3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person to create an inference of job discrimination.  Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir.  2001); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (*en banc*.) The fourth element may also be established by showing that the employer had a continuing need for someone to perform the same work after the plaintiff left the position.  Pivirotto, 191 F.3d at 354.  When a plaintiff alleges that she was suffered an adverse employment action as a result of age discrimination, she must show that age "actually motivated the employer's decision."  Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004), *quoting* Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).  That is, "the plaintiff's age actually must have played a role in the employer's decision making process and had a determinative influence on the outcome of that process."  Monaco, id., *citing* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).

The Court has reviewed Plaintiff's memorandum opposing the UPMC motion and found it completely devoid of argument on the issue of age discrimination.  We are cognizant of the fact that although Fed.R.Civ.P. 56(e) requires a non-moving party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial," at the same time, "this does not mean that a moving party is automatically entitled to summary

judgment if the opposing party does not respond." <u>Anchorage
Assoc. v. Virgin Islands Bd. of Tax Review</u>, 922 F.2d 168, 175 (3d
Cir. 1990).  However, if the non-moving party has the burden of
proof at trial, summary judgment will be granted if "the
nonmovant fails to make a showing sufficient to establish the
existence of an element essential to [its] case." <u>Celotex</u>, 477
U.S. at 322.

Despite the lack of argument on this issue, the Court has
carefully reviewed the record to determine if there is evidence
which would support Ms. Sanders' claims of age discrimination.
We have been able to find only four references to Ms. Sanders'
age.  First, on approximately August 31, 1999, Ms. Sanders
attended a meeting with Ms. Stevens and Sue Blewitt, one of her
preceptors.  Ms. Blewitt allegedly stated that she had
reservations about older nurses and had never trained anyone who
had been out of school as long as Ms. Sanders or was as old as
she.  (Plf.'s App. 3, Sanders Depo. at 197-199.)  Second, on
September 13 or 14, 1999, Lori Stevens, the manager of a non-
critical care unit to which Ms. Sanders had been assigned, told
Plaintiff that "the learning curve was different for her," to
which Ms. Sanders responded by inquiring whether Ms. Stevens
based this assessment on the fact that she was over 40 or was
African-American; Ms. Stevens did not respond to this question.
(<u>Id.</u> at 194-195.)  Third, Ms. Walters, in the undated record of a
conversation about Ms. Sanders, notes without comment that

Plaintiff is over forty.  (Walters Depo. at 64-68 and Depo. Exh. 5.)  Finally Michael Payne, who joined Shadyside in September 1999 as a human resource specialist reporting to Ms. Walters, referred to Plaintiff's age and race as "side issues" in an e-mail related to Ms. Sanders' unsatisfactory orientation in the Med/Surg ICU.  (Sweeney Depo. Exh. 1.)  In contradiction to her claims that she complained of age discrimination in her conversations with Ms. Smith, Ms. Sanders states that she "made it clear in the period between August 2 and August 5, 1999, that she believed the conduct was related to *racial* discrimination and questioned whether there was a *racial* discrimination problem at Shadyside."  (Plf.'s Opp. to UPMC Mot. at 32, emphasis added.) There is no evidence that she ever complained to any Shadyside employee about age discrimination.

The comments by Ms. Walters and Mr. Payne were simply statements of fact, made in a neutral way that does not give rise to an inference of age discrimination, and those statements were relevant to their positions as human resource specialists of the employer.  Even if one accepts Plaintiff's implication that Ms. Blewitt's remarks on August 31 reflected age bias, there is no evidence that she participated in any employment decision concerning Ms. Sanders.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold, 983 F.2d at 545.    To

the extent age discrimination could possibly be construed from
Ms. Stevens' remarks, any such inference was created by Ms.
Sanders' response.

Given the lack of evidence that age "motivated" the decision
by Shadyside to terminate Plaintiff's employment, the conclusion
above that Ms. Sanders was not qualified for the position she
held, and the complete lack of argument to support the
allegations of age discrimination in her Second Amended
Complaint, summary judgment must be granted to UPMC Defendants on
Count VIII.

4.   *Count IX – Retaliation*

Finally, in Count IX, Plaintiff claims that after
she complained of racial discrimination in early August 1999,
Shadyside began to perceive her as a troublemaker, referred to
her by race and age in memoranda, tried to prevent her from
speaking to or working with other African-American employees, and
treated her "as a criminal" when her employment was terminated by
posting her photograph in the security office.  (Compl., ¶¶ 269-
270.)  Plaintiff also claims that unidentified persons at UPMC
retaliated against her because they knew she was associated with
Mr. Ewell and consequently knew of his claims of discrimination
against the SON.  (Id., ¶ 235.)  As a result of this association,
she contends that Shadyside decided that it did not want a
"troublemaker" such as herself on its staff and thus intended
from the beginning to dismiss her.  (Id., ¶ 238.)

Although Plaintiff does not specify the basis of her retaliation claim, for purposes of analysis, this question is irrelevant inasmuch as retaliation under either Title VII, the ADEA, or Section 1981 is analyzed under the McDonnell Douglas paradigm.  UPMC Defendants argue they are entitled to summary judgment on this claim because Plaintiff cannot establish a *prima facie* case.  (UPMC Brief at 11-14.)  The Court agrees.

To establish a *prima facie* case of retaliation, a plaintiff must show:  (1) that she engaged in protected activity; (2) that she was subject to an adverse employment action subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and the adverse action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).

Plaintiff contends that the protected activity in which she engaged was complaining to Ms. Smith on August 2, 1999, that she had been "treated inappropriately" by the supervisor of the Neuro ICU who told her on July 30, 1999, to "get out of my ICU. . . now. . . go back to where you came from."  (Plf.'s Opp. to UPMC Mot. at 32; Plf.'s App. 3, Sanders Depo. Exh. 23 at 4.)  She reiterated similar complaints on August 10 when she questioned the lack of African-American nurses in the Med/Surg and Neuro ICUs.  (Plf.'s Sec. Supp. Aff., ¶ 20.)  She also complained to Dorinda Sutton, the Manager of Information Systems, about racially discriminatory treatment. (Plf.'s Opp. to UPMC Mot.,

id.)  Even though there is no evidence that Ms. Sutton either communicated those complaints to any other UPMC employee or that she was involved in any subsequent decision concerning Ms. Sanders, we will assume that Plaintiff's informal complaint of discrimination to Ms. Sutton constituted protected activity for purposes of establishing a *prima facie* case of retaliation.  *See* Neiderlander v. American Video Glass Co., No. 03-1288, 2003 U.S. App. LEXIS 22745, * 12 (3d Cir. Nov. 5, 2003) (opposition to discriminatory practices need not be made directly to managers in order to constitute protected activity; assuming for purposes of summary judgment that statements to co-workers were communicated to management, those would also constitute protected activity.)

Plaintiff claims that once she had complained to Ms. Smith about discrimination, "she never again worked as a nurse" in the Med/Surg ICU; no preceptor would sign her "green book[23];" she was shuffled among numerous preceptors contrary to usual Shadyside policy; she was "made to work as a nurse's assistant, a position requiring limited training and held by mostly black employees which made it apparent that someone judged her to be too inept to work as a nurse."  She was terminated without warning before completing orientation; accompanied by security guards when she retrieved her personal belongings from her locker; and subjected

---

[23]  The "green book" was a journal in which a nurse undergoing orientation recorded summaries of what patient care and other activities she had done that day.  The green book was also used by the preceptors to record their impressions of the nurse's performance and to suggest areas of improvement.  (Sanders Depo., *passim*.)

to the humiliation of having her picture posted in the guard station.  Finally, she was designated as unsuitable for future employment in the UPMC Health System employee database.  (Plf.'s Opp. to UPMC Mot. at 32-33.)

First, with regard to Plaintiff's claims of retaliation in that "she never again worked as a nurse" in the Med/Surg ICU, that preceptors failed to sign her green book, and that she was shuffled among numerous preceptors, the Court concludes that none of those events qualifies as an adverse employment action.  *See* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998), holding that adverse employment actions encompass tangible employment actions such as "hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits."  However, with regard to her claim that she was assigned work inappropriate to a registered nurse, the Third Circuit has noted that transfers, demotions, and other employment decisions that significantly "alter an employee's compensation, terms, conditions or privileges of employment" may also constitute adverse employment actions "if they deprive her of employment opportunities, or adversely affect her status as an employee." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) (internal quotations omitted).  "Minor or trivial actions that merely make an employee 'unhappy' are not sufficient" to establish a *prima facie* case, "for otherwise every action that an irritable, chip-on-the-shoulder employee did not

64

like would form the basis of a discrimination suit."
Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998).

Ms. Sanders has not presented evidence that she was formally demoted to the position of nurse's assistant, that she was paid less, or that the change in responsibilities was permanent.  "A transfer involving no reduction in pay and no more than a minor change in working conditions will not do."  Farmer v. Camden City Bd. of Educ., No. 03-685, 2005 U.S. Dist. LEXIS 7339, at *13 (D. N.J. March 28, 2005) (quotation omitted.)  Plaintiff's records show that she worked only two days as a nurse's assistant, on August 9 and 10, 1999.  (Plf.'s App. 3, Sanders Depo. Exh. 24.)  Thus, while she may not have viewed this reassignment as "minor or trivial," it does not rise to the level of an adverse employment action.

Nor is there any evidence that Caucasian employees were not terminated without warning during orientation, subjected to the same security measures as she, or that similar comments about re-employment were not also made in their records.

As to the events surrounding her termination, UPMC Defendants argue that Ms. Sanders cannot establish a *prima facie* case of retaliation because the individuals who made the decision to terminate her – Ms. Sweeney, Ms. Martin and Ms. Walters – did not know that in early August she had complained to Ms. Smith about racial discrimination.  (UPMC Brief at 13.)  Plaintiff

counters that there is a material question of fact about whether
Ms. Smith played a role in the decision to terminate her
employment and contends that "given the documentation and timing
of the events," she has raised strong inferences that Ms.
Walters, Ms. Martin, and Ms. Sweeney knew that she had complained
to Ms. Smith.  She also claims that the "time of Smith's plan to
discipline or discharge Sanders in relation to her complaints of
discrimination suggests discriminatory motives creating a factual
issue regarding motivation and retaliation that properly belongs
to the factfinder."  (Plf.'s Opp. to UPMC Mot. at 36.)

If we assume for the sake of analysis that the four
individuals in question – Smith, Sweeney, Martin and Walters –
were all involved in the decision to terminate her, and also
assume that the latter three were aware, through communications
with Ms. Smith, that Plaintiff had complained of racial
discrimination in early August, we still must establish a causal
link between those complaints and her termination.  The timing is
certainly probative – on August 2, the same day Ms. Sanders first
complained to Ms. Smith, Judy Jim e-mailed the human resources
department noting that Ms. Smith was having "major problems" with
Plaintiff who was "doing some bizarre things," and that Ms. Smith
was "probally [sic] going to try and discipline or fire Sanders."
(Pelisari Depo. Exh. 2.)

Whether the causal connection may be inferred solely from
the close proximity in time between the protected activity and

the adverse action is dependent upon the particular factual circumstances of a given case.  <u>Farrell</u>, 206 F.3d at 280.  "The mere fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 504 (3d Cir. 1997), *quoting* <u>Robinson</u>, 120 F.3d at 1302.  A court considering this question at summary judgment may take into account the totality of circumstances, for instance, whether the adverse action "occurred in response to different incidents, none of which can be linked to plaintiff's complaints about discrimination."  <u>DeGuzman v. New Jersey</u>, No. 03-4436, 2004 U.S. App. LEXIS 21008, **9 (3d Cir. Oct. 8, 2004) (unpublished); <u>Farrell</u>, 206 F.3d at 281 (evidence probative of a causal link can be inferred from evidence "gleaned from the record as a whole.")

Here, Plaintiff was terminated two months after she complained of discrimination, a period the Third Circuit has concluded may not be "so close as to be unduly suggestive." <u>Williams v. Phila. Hous. Auth. Police Dep't</u>, 380 F.3d 751, 760 (3d Cir. 2004), *cert. denied*, 2005 U.S. LEXIS 2974 (U.S., April 4, 2005).  As discussed above, her performance shortcomings had been noted and discussed with her prior to the date on which she complained and repeatedly thereafter.  *See*, for instance, her preceptor's notes for the period July 21 through 24; comments made in the July 28, 1999 meeting about "certain things that she

shouldn't have missed" and her marginal performance on
orientation tests; her inability to use the computerized medical
order system; and the fact that she was moved to a non-critical
care unit to refresh her basic nursing skills.  In short, this is
not a situation like that in Kachmar v. Sungard Data Systems,
Inc., 109 F.3d 173, 177-178178 (3d Cir. 1997), where the
"circumstantial evidence of a pattern of antagonism" followed the
protected conduct; here, the criticisms of Ms. Sanders'
performance preceded as well as followed her complaints on August
2 and August 10.  Compare Preobrazhenskaya v. Mercy Hall
Infirmary, No. 02-3190, 2003 U.S. App. LEXIS 16347, ** 8 (3d Cir.
July 30, 2003) (unpublished), affirming summary judgment for
employer where there was "ample evidence of the deterioration of
the relationship between the parties arising from causes other
than [the plaintiff's] complaint to the Department of Labor."

Even if we assume for the sake of analysis that Plaintiff
has established a prima facie case of retaliatory discharge based
on the temporal proximity of the events at Shadyside, she has not
necessarily eluded summary judgment.  We now proceed to step two
of the McDonnell Douglas analysis in which the defendant must
come forward with evidence of a legitimate non-discriminatory or
non-retaliatory reason for the adverse employment action.  Here,
Defendants claim that Ms. Sanders was discharged because she
failed to meet the basic requirements associated with working in
a critical care unit.  This was explained in the October 13, 1999

termination letter, which states in part:

> This decision is based on the need for a competent and
> autonomous clinical nurse to care for the complex
> critical care population.  The time invested in your
> orientation for the development of fundamental nursing
> skills has far exceeded any normative critical care
> orientation.  The time required to master basic skills,
> critical thinking, prioritization and critical care
> knowledge base would far exceed any institution's
> orientation parameters.

(Sweeney Depo. Exh. 38.)

This conclusion was supported by numerous examples of Ms.
Sanders' unsatisfactory performance – failure to complete the
initially scheduled orientation sessions, failure to return
telephone calls about her starting date, failure to begin on the
scheduled start date, inconsistent information about why she had
not taken a basic critical care class, failure to hand in her
orientation documentation, and the performance shortcomings noted
above.  (Id.)

Once Defendants have satisfied their burden of production at
step two, Plaintiff must come forward with evidence of pretext
such that "a factfinder could reasonably either (1) disbelieve
the employer's articulated legitimate reasons or (2) believe that
an invidious discriminatory reason was more likely than not a
motivating or determinative cause of the employer's action."
Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002).

We conclude that Plaintiff has failed to satisfy step three
of the required analysis.  With one exception, she points to no
inconsistencies or contradictions between her preceptors' notes

prior to the termination meeting on October 4 and the notes of
that meeting as prepared by Ms. Walters versus the content of the
termination letter.  The single exception is a statement in the
letter to the effect that during the meeting, Ms. Sanders stated
that she had copied parts of her patients' medical records to
facilitate her green book documentation.  (Sweeney Depo. Exh.
38.)  According to other notes of the October 4 meeting, Ms.
Sanders had said she redacted the names on patients' charts and
took them home with her, a violation of hospital policy.
(Walters Depo. Exh. 23.)  Although Plaintiff denies that she took
the charts home, she conceded that she used discarded computer
printouts containing patient information "to be able to
accurately record the work that [she] did and the skills that
[she] learned."  (Plf.'s Sec. Supp. Aff., ¶ 25; Plf.'s Opp. to
UPMC Mot. at 17-18.)  Even if there is a dispute about whether
she used the computer sheets at home or at the hospital,
Plaintiff has offered nothing to show that the primary reason
given for her termination – that she was incapable of working in
an intensive care unit because she did not have the necessary
skills – was unworthy of credence, inconsistent with other
evidence in the record, implausible or self-contradictory.  In
sum, because Plaintiff has presented no evidence other than
temporal proximity to suggest a causal link between her
termination and her complaints of racial discrimination to Ms.
Smith, and because the evidence supporting Shadyside's

explanation for her termination is "quite compelling," we find that "no reasonable jury could conclude that the two events shared a causal link for purposes of [a] retaliation claim." Williams, 380 F.3d at 761.

Summary judgment will be granted to UPMC Defendants with regard to the claims of unlawful retaliation brought in Counts VI, VII and IX.

An appropriate Order follows.